IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NEPC, INC. | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:12-CV-00706 |
| | § | |
| MEI, LLC D/B/A MEI RIGGING & | § | |
| CRATING, LLC | § | |
| | § | |
| DEFENDANT. | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant MEI, LLC d/b/a MEI Rigging & Crating, LLC ("MEI") requests a final summary judgment that the Plaintiff NEPC, Inc. ("NEPC") take nothing on its claims of breach of contract, *quantum meruit* and attorneys' fees against MEI. In support of this motion, MEI is contemporaneously filing *Defendant's Brief in Support of Motion for Final Summary Judgment* (the "Brief") and an *Appendix to Defendant's Motion for Final Summary Judgment* in four volumes ("App.").

### I.    NATURE AND STAGE OF THE PROCEEDING

On January 30, 2012, NEPC filed *Plaintiff's Original Petition and Request for Disclosure* (the "Petition") in the 269th Judicial District Court of Harris County, Texas.[1] NEPC alleges that NEPC and MEI entered, and then MEI breached, a valid and enforceable written contract (or, alternatively, MEI is liable under the theory of *quantum*

---

[1] Dkt. no. 1 at ex. A.

*meruit*), and requests $211,194.15 in actual damages plus attorneys' fees and costs.[2]  On February 29, 2012, MEI filed its *Original Answer* in the state court action.[3]

On March 7, 2012, MEI filed its *Notice of Removal* with this Court on the basis of diversity.[4]  On March 13, 2013, NEPC filed its *Demand for Jury Trial*.[5]  On March 28, 2012, MEI filed its *First Amended Answer*.[6]  On June 29, 2012, MEI filed its *Second Amended Answer*, which is MEI's live pleading.[7]  MEI denies the validity of NEPC's claims for a myriad of reasons, including those explained in this motion and the Brief.[8]

On May 9, 2012, after the parties provided their consent, this action was reassigned to United States Magistrate Judge George Hanks.[9]  The Court entered its *Minute Entry Order* on March 22, 2013, setting, among other things, the deadline for filing dispositive motions as May 10, 2013 and the jury trial date for July 8, 2013.  MEI now timely moves for final summary judgment on NEPC's claims.

## II.    BRIEF SUMMARY OF THE MOTION

NEPC's claims fail as a matter of law for the following reasons:

1)    The alleged contract at issue is not a valid, enforceable contract. Specifically, the alleged contract (a) was executed prior to NEPC's existence and was never ratified by NEPC; and (b) merely contemplates an actual marketing service contract be entered in the future.

---

[2] *Id.*
[3] *Id.*
[4] Dkt. no. 1.
[5] Dkt. no. 3.
[6] Dkt. no. 6.
[7] Dkt. no. 14.
[8] *Id.*
[9] Dkt. nos. 9, 11.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                    **2**

2)      NEPC cannot prove it performed its obligations under the alleged contract, as best as those obligations can be deciphered.  For example, NEPC failed to (a) provide MEI with a list of customers as of the alleged effective date of the contract; (b) perform marketing services or generate revenues on behalf of MEI, particularly during the time period for which NEPC now claims damages; (c) provide MEI evidence that, for any revenues generated on MEI's behalf, pricing was appropriate relative to MEI's pricing lists and profitability measurements; and (d) cause purchase orders to be made directly to MEI.

3)      NEPC cannot prove MEI breached the terms of the alleged contract;

4)      NEPC cannot prove damages.  NEPC fails to show the amount of the damages it *actually* sustained with any certainty and, instead, puts forth a "guesstimate;"

5)      NEPC's *quantum meruit* claim fails as a matter of law because NEPC is unable to identify anything of value that it provided to MEI, including, importantly, during the time period in which NEPC alleges it earned unpaid commissions; and

6)      NEPC is not entitled to recover attorneys' fees as a matter of law.  NEPC bases its fees claim on its breach of contract claim.  Because NEPC cannot prevail on its contract claim, it is not entitled to attorneys' fees.

In addition, MEI can prove its affirmative defenses as a matter of law:

1)      The agreement at issue does not satisfy the statute of frauds.  The agreement—to the extent it is a contract—clearly falls within the ambit of the statute of frauds because it explicitly calls for performance over a period of longer than one year.  The agreement violates the statute of frauds because it (a) is not signed by MEI, the party

to be charged with the promise; (b) contains futuristic language and contemplates a contract to be made in the future; and (c) contains terms that are neither sufficiently definite nor complete within themselves; and

2)      MEI is excused for any alleged breach of the agreement by NEPC's repudiation and prior breaches.

### III.   UNDISPUTED FACTS

**A.      The Parties.**

   i.      <u>MEI</u>

MEI was formed in 2004 to perform rigging and crating functions and produce wet processing equipment.[10]   At the end of 2012, MEI created two subsidiaries, MEI Rigging & Crating, LLC and MEI Wet Processing Services, LLC.[11]   The former took over the rigging and crating functions of MEI, while the latter took over production of wet processing equipment.[12]   Currently, MEI, is the holding company that provides administrative services to these subsidiaries.[13]   Daniel J. Cappello is part-owner and Chief Executive Officer of MEI.[14]   Seth Christensen is Chief Financial Officer of MEI.[15]

   ii.      <u>NEPC</u>

NEPC was formed on May 5, 2011, the date its certificate of formation was filed with the Office of the Secretary of State of Texas.[16]   NEPC's board of directors consists

---

[10] Exhibit 1, 8:19-20, 15:25 – 16:3 (App. 4, 6); Exhibit 2, 27:14-15 (App. 36).
[11] Exhibit 1, 10:19-24, 15:25 – 17:7 (App. 5-6).
[12] *Id.*
[13] *Id.*, 15:16-22 (App. 6).
[14] *Id.*, 8:15-25 (App. 4); Exhibit 2, 26:22 – 27:4 (App. 36).
[15] Exhibit 1, 8:15-25, 10:6-12 (App. 4-5).
[16] Exhibit 3, 25:3-21 (Ms. Moscariello's concession that NEPC not in existence prior to May 5, 2011) (App. 47); Exhibit 4, 29:20 – 30:2 (Ms. Morris' concession that NEPC was formed on May 5, 2011) (App. 62-63); Exhibit 5, 16:3 – 17:2 (App. 68); Exhibit 7, 43:18 – 44:4 (Mr. Morris' concession that NEPC's certificate of filing shows NEPC was incorporated on May 5, 2011) (App. 115); Exhibits 8-9 (App. 126-31).

of two directors, Dolores Moscariello and Valeri Morris.[17]   NEPC is co-owned by Ms. Moscariello and Ms. Morris.[18]   Ms. Moscariello serves as NEPC's president, and Ms. Morris serves as NEPC's secretary and registered agent.[19]   Ms. Moscariello and Ms. Morris work full-time as flight attendants, have no experience in the packing and crating business, and never engaged in any such sales work.[20]   NEPC has two other employees, Emil Moscariello (Dolores Moscariello's husband) and Garry Morris (Valeri Morris' husband).[21]   Messrs. Moscariello and Morris' duties as employees of NEPC were never specified.[22]

NEPC does not have any assets.[23]   It does not keep any records besides its formation documents and bank statements from an account that does not hold any money.[24]   NEPC does not pay any salaries or dividends.[25]   It does not lease any office space.[26]

### iii.   Coastal Crating

Mr. Moscariello was previously employed by Coastal Crating Company, Ltd. ("Coastal Crating"), an export packing company.[27]   He started as Coastal Crating's

---

[17] Exhibit 5, 13:11-19 (App. 67); Exhibit 8 (App. 128).
[18] Exhibit 3, 9:13-21, 10:1-4 (App. 43-44); Exhibit 4, 22:22-25 (App. 61); Exhibit 5, 13:11-19 (App. 67); Exhibit 7, 20:3-5 (App. 109).
[19] Exhibit 3, 8:25 – 9:19, 10:1-4 (App. 43-44); Exhibit 4, 22:22-25 (App. 61); Exhibit 7, 20:6-11 (App. 109); Exhibit 8 (App. 128).
[20] Exhibit 3, 8:18-24, 20:4-20 (App. 43, 46); Exhibit 4, 4:20 – 5:10, 6:17-19 (App. 56-57).
[21] Exhibit 4, 12:16-22 (App. 58); Exhibit 5, 12:11-19 (App. 67); Exhibit 7, 20:3-21 (App. 109).
[22] Exhibit 5, 13:20 – 14:10 (App. 67-68).
[23] Exhibit 3, 12:6-11 (App. 44); Exhibit 4, 12:23-24 (App. 58).
[24] Exhibit 3, 19:16-19, 25:22 – 26:6 (App. 46-48); Exhibit 4, 18:9-13, 33:18-23 (App. 60, 63); Exhibit 5, 23:13-15 (App. 70).
[25] Exhibit 5, 23:16-21 (App. 70); Exhibit 7, 21:3-7 (App. 109).
[26] Exhibit 5, 23:22-24 (App. 70).
[27] *Id.*, 32:11 – 33:17 (App. 71A); Exhibit 7, 8:21 – 9:11 (App. 106A).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                    **5**

operations manager in 1992, then became vice president of operations, and finally became president of the company before being removed in March 2011.[28]

Mr. Morris was also previously employed by Coastal Crating, starting in 2004.[29] He started as a sales manager and later became vice president of sales before being removed in January 2011.[30]  Both Messrs. Moscariello and Morris performed marketing services on Coastal Crating's behalf, working to bring sales, accounts, and packing-and-crating business to Coastal Crating.[31]  At some point, Messrs. Moscariello and Morris became co-owners of Coastal Crating.[32]

Coastal Crating filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code on August 31, 2010.[33]  Coastal Crating operated its business as a debtor-in-possession from that time until as recently as April 14, 2013, at which time the estate had been fully administered and the bankruptcy court issued its final decree releasing Coastal Crating from bankruptcy.[34]

---

[28] Exhibit 5, 32:22 – 33:17 (App. 71A); *In re: Coastal Crating Company, Ltd.*, case no. 4:10-bk-37421, S.D. Tex. (J. Bohm) at dkt no. 101 (court order that Mr. Moscariello be removed from his "current responsibilities" with Coastal Crating as of March 31, 2011).  Pursuant to Federal Rule of Evidence 201, this Court may "judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources who accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b)(2).  MEI requests that the Court take judicial notice of the Coastal Crating bankruptcy docket (particularly the contents of the docket entries referenced herein), as it can be accurately and readily determined from a review of the PACER or CM/ECF systems.

[29] Exhibit 5, 39:16-19 (App. 73); Exhibit 7, 8:21 – 9:11, 48:17 – 49:7 (App. 106A, 116).

[30] Exhibit 7, 48:17 – 49:7 (App. 116); *In re: Coastal Crating Company, Ltd.*, case no. 4:10-bk-37421, S.D. Tex., at dkt no. 101 (court order that "[t]he employment with [Coastal Crating] of Gary Morris shall be terminated effective January 31, 2011").

[31] Exhibit 5, 34:15 – 35:7 (App. 72); Exhibit 7, 8:21 – 9:11 (App. 106A).

[32] Exhibit 7, 71:4-15 (App. 121).

[33] *See In re: Coastal Crating Company, Ltd.*, case no. 4:10-bk-37421, S.D. Tex., at dkt. no. 1.

[34] *Id.* at dkt. nos. 211-12; *see also* Exhibit 5, 36:10 – 37:23 (Mr. Moscariello's concession that Coastal Crating was allowed to continue operating as debtor in possession after filing bankruptcy) (App. 72).

**B.      Interactions between the Parties.**

      i.      <u>MEI's Contemplated Acquisition of Coastal Crating</u>.

In 2010, MEI explored the possible acquisition of Coastal Crating.[35]  It was in this context that Messrs. Christensen and Cappello came to know Mr. Moscariello, who was then president of Coastal Crating.[36]  Ultimately, discussions regarding the acquisition went nowhere because Coastal Crating filed for Chapter 11 bankruptcy in August of 2010.[37]

      ii.      <u>Marketing Services Agreement Parameters</u>.

In February 2011, Messrs. Christensen and Cappello began discussions with Mr. Moscariello in which NEPC was presented as being able to perform sales work on behalf of MEI.[38]  A document entitled Marketing Services Agreement Parameters (the "MSA Parameters") was created to set out the parameters of a ***future marketing services agreement*** under which NEPC would provide sales work for MEI.[39]  Mr. Morris concedes that the MSA Parameters is merely general parameters for an anticipated marketing services agreement to be entered in the future [40]:

> Q.      That's titled "Marketing Services Agreement Parameters."  Do you see that?
>
> A.      Yes.
>
> Q.      And it specifically says the parties will enter into a Marketing Services Agreement.  Isn't that what the first sentence is saying?

---

[35] Exhibit 1, 21:8-16, 60:15-20 (App. 7, 17); Exhibit 2, 31:2-14 (App. 37).
[36] *Id.*
[37] *Id.*; *see also In re: Coastal Crating Company, Ltd.*, case no. 4:10-bk-37421, S.D. Tex., at dkt. no. 1.
[38] Exhibit 1, 20:16-21, 38:1-8 (App. 7, 12).
[39] *Id.*, 22:7-15, 23:21-23, 27:2-14, 36:16 – 37:3, 79:23 – 80:3 (App. 8-9, 11, 22); Exhibit 2, 33:21 – 34:1 (App. 37-38); Exhibit 5, 55:3-15, 56:1-15 (App. 77); Exhibit 7, 26:2-14 (App. 111); Exhibit 10 ("MEI ***will engage*** NEPC in a marketing services agreement with the following parameters") (App. 132).
[40] Exhibit 7, 26:2-14 (App. 111).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                      **7**

A.     Yes.

Q.     Right.  So this agreement is laying out the parameters of what the parties anticipate will become a Marketing Services Agreement, right?

A.     Okay.

Q.     And that's "okay" meaning "yes"?

A.     Yes.

Mr. Moscariello likewise acknowledges that the MSA Parameters does not reflect a current, existing contract between MEI and NEPC[41]:

Q.     [T]he first page, first sentence [of the MSA Parameters].  Can you read that into the record?

A.     "MEI will engage NEPC in a marketing service agreement with the following parameters."

Q.     Right.  What I want to emphasize there is that it will engage.  That's what the sentence is, right?  "MEI will engage NEPC …"  Do you see that?

A.     Yes.

Q.     It does not say that MEI has engaged NEPC, does it?

A.     It does not.

As further testified to by Mr. Moscariello, the term "parameters," as used in the MSA Parameters document, means "[j]ust a summary or overlook of what – how we were going to get paid based on revenue."[42]

     *1.*     *NEPC admits it did not read the MSA Parameters before execution.*

Ms. Moscariello and Ms. Morris signed the MSA Parameters on behalf of NEPC.[43]   However, **_neither Ms. Moscariello nor Ms. Morris read, reviewed or_**

---

[41] Exhibit 5, 56:1-15 (App. 77).
[42] *Id.*, 55:3-15 (App. 77).
[43] Exhibit 4, 19:13-22 (App. 60); Exhibit 10 (App. 134).

*understood what they were signing*.[44]   Ms. Moscariello's testimony regarding her execution of the MSA Parameters is as follows[45]:

> I never read the contract actually.  I was just asked to sign it, and so I did.
>
> ***
>
> I probably wouldn't have understood it, anyway.
>
> ***
>
> I don't understand it.

> 2.    *NEPC executed the MSA Parameters before its corporate existence and never ratified or adopted the MSA Parameters.*

NEPC admits (judicially and otherwise) that it "entered into" the MSA Parameters on February 1, 2011.[46]   Even though **NEPC concedes it entered into the MSA Parameters before its corporate existence** (May 5, 2011[47]), **NEPC never went about ratifying or adopting the MSA Parameters as its own**.[48]   In fact, Mr. Moscariello concedes that NEPC has not issued any resolutions to that effect.[49]   Ms. Moscariello concedes that no corporate documents exist reflecting any actions by NEPC's board of directors.[50]   Ms. Morris concedes that NEPC has not passed any resolutions or taken any

---

[44] Exhibit 3, 17:18-24 (Ms. Moscariello's concession that she did not read MSA Parameters before signing), 18:24 – 19:1 (did not understand MSA Parameters when she signed it), 27:5-17 (signed MSA Parameters without reviewing it), 28:10-14 (currently does not understand MSA Parameters) (App. 45-46, 48); Exhibit 4, 19:23-25 (Ms. Morris' concession that she did not review MSA Parameters before signing), 14:15-18 (does not "have a clear understanding of the agreement"), 16:13-16 (had no involvement in negotiating MSA Parameters) (App. 59-60).
[45] *See id.*
[46] Dkt. no. 1 at ex. A (Petition), ¶ 9; Exhibit 5, 17:23 – 18:1 (App. 68-69).
[47] *See supra* note 16.
[48] Exhibit 3, 25:24 – 26:6 (App. 47-48); Exhibit 4, 7:11-21, 9:15-17, 18:9-13, 33:7-23 (App. 57, 60, 63); Exhibit 5, 19:19-25 (App. 69).
[49] Exhibit 5, 19:19-25 (App. 69).
[50] Exhibit 3, 25:24 – 26:6 (App. 47-48).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                    **9**

corporate acts, and that, other than NEPC's formation records and bank statements, NEPC has no other corporate books or records.[51]

>    3.    *MEI never signed or proceeded with a formal Marketing Services Agreement due to Mr. Morris's bad acts.*

**MEI never signed the MSA Parameters nor proceeded with the preparation of an actual marketing services agreement**.[52]   MEI did not receive the signed copy from NEPC until May 2011.[53]   Around the same time MEI received the copy of the MSA Parameters signed by NEPC, MEI discovered that Mr. Morris had contacted a competitor of MEI with the express intent of placing an MEI account with them.[54]   Indeed, Mr. Morris conceded such actions to MEI when confronted.[55]   Around the same time, it also came to MEI's attention that Mr. Morris made disparaging and denigrating remarks about MEI to a third party.[56]   As a result, on May 26, 2011, MEI sent a letter to NEPC recounting Mr. Morris' actions, informing NEPC that MEI did not have any faith that Mr. Morris can represent MEI appropriately, and asking that Mr. Morris be removed from any work being performed by NEPC on MEI's behalf.[57]   Due to Mr. Morris' conduct, as well as MEI's uncertainty regarding the extent of such conduct and whether it was being

---

[51] Exhibit 4, 7:11-21, 9:15-17, 18:9-13, 33:7-23 (App. App. 57, 60, 63); *see also* Exhibit 5, 23:13-15 (Mr. Moscariello's concession that NEPC has no records) (App. 70).

[52] Exhibit 1, 22:7-15, 27:7-14, 39:8-11, 79:23 – 80:11 (App. 8-9, 12, 22); Exhibit 3, 38:13 – 39:10 (Ms. Moscariello's concession that she is not a representative of MEI and was not acting on MEI's behalf when she signed MEI's signature block on MSA Parameters) (App. 51); Exhibit 5, 8:1-2, 54:17-21, 54:25 – 55:2 (App. 66A, 77); Exhibit 7, 21:21-25, 35:7-14 (App. 109, 113); Exhibit 10 (App. 134); Exhibit 14 at request no. 10 (NEPC's admission that Ms. Moscariello was never authorized to act for or on behalf of MEI) (App. 144).  MEI anticipated that any marketing services agreement would be drafted by its corporate counsel.  Exhibit 1, 38:13-24 (App. 12).

[53] Exhibit 1, 79:23 – 80:11 (App. 22).

[54] *Id.*; Exhibit 1, 45:20-25, 80:4-11 (App. 13, 22); Exhibit 2, 10:20 – 11:1, 11:23 – 12:7 (App. 32); Exhibit 13 (App. 139).

[55] Exhibit 1, 55:5-9 (App. 16); Exhibit 2, 11:23 – 12:7 (App. 32); Exhibit 13 (App. 139).

[56] Exhibit 1, 45:20 – 46:5 (App. 13-14); Exhibit 2, 8:11 – 9:18 (App. 31); Exhibit 13 (App. 139).

[57] Exhibit 13 (App. 139).

carried out by others at NEPC, MEI never signed the MSA Parameters, did not move forward with the preparation of any actual marketing services agreement, and notified NEPC that it was suspending any right of NEPC to perform work on MEI's behalf pending further investigation.[58]

       4.    *The MSA Parameters contemplates performance more than five years into the future.*

NEPC concedes the MSA Parameters contemplates performance over a period longer than one year.[59]

Q.    What amount of moneys is NEPC expecting to recover from MEI in this lawsuit?

A.    Well, I guess based on the agreement, which extends out to 2016, that's what we're expecting or that's what NEPC's expecting.

Q.    So NEPC sees this as an agreement that runs from February 1, 2011, through at least July 30, 2106.  Is that correct?

A.    That's correct.

Q.    So, NEPC sees this as at least a five-year agreement?

A.    Correct.

Q.    Have you had any discussions with Garry Morris about the length of the agreement.

A.    No more than what we just talked about, that it extends to 2016.

Q.    So you and Garry Morris have talked about the Marketing Services Agreement Parameters lasting until 2016?

A.    Correct.

Q.    And did Garry Morris agree with you that the agreement lasts until 2016?

A.    I believe he did, yes.

---

[58] *Id.*
[59] Exhibit 5, 81:19 – 82:17 (App. 83-84).

5. *NEPC never provided MEI with a list of customers.*

Although the MSA Parameter contemplates NEPC doing so,[60] **NEPC never provided MEI with a list of customers associated with NEPC as contemplated by the MSA Parameters**.[61]   MEI has made it clear that it never received a customer list from NEPC prior to this litigation.[62]   Ms. Moscariello and Ms. Morris both testified that they do not even know if NEPC has any customers, much less whether NEPC provided MEI with customers.[63]   Mr. Moscariello cannot make up his mind.  At one point, he likewise testifies that he does not know whether NEPC either had or provided MEI with a list of customers, including at the time of the alleged effective date of the MSA Parameters (February 2011) or at the time of NEPC's incorporation (May 2011).[64]   In another instances, he contends that MEI was provided with a list of customers in February 2011,[65] but concedes that (1) NEPC did not exist at that time and, thus could not have any assets, such as customer lists, and (2) the list allegedly provided to MEI came from Coastal Crating—**not NEPC**[66]:

> Q.     Did NEPC have a list of customers in February of 2011?
> A.     I don't recall.

---

[60] Exhibit 10 at ¶ 5 (App. 132).

[61] Exhibit 1, 24:18 – 25:1, 93:15 – 94:20 (App. 8, 25-26); Exhibit 7, 15:3-11, 32:1-13, 32:19 – 33:18 (App. 108, 112).

[62] *Id*.

[63] Exhibit 3, 16:2-3, 21:25 – 22:2, 30:3-5, 31:10-21, 41:17 – 42:9, 46:24 – 47:2 (App. 45-47, 49, 51-52, 53); Exhibit 4, 11:8-13, 16:17-24 (App. 58-59); *see also* Exhibit 3, 12:6-7 (Ms. Moscariello's concession that NEPC does not have any assets) (App. 44); Exhibit 4, 12:23-24 (Ms. Morris' same concession) (App. 58).

[64] Exhibit 5, 41:10 – 42:8; 68:2-4 (App. 73-74, 80).

[65] Mr. Moscariello claims a list existed at one time but has "miraculously disappeared," and, as a result, NEPC has created a new list for purposes of this litigation (*i.e.*, Exhibits 11 and 12, App. 135-38).  Exhibit 5, 9:8 – 10:4, 74:24 – 77:10 (App. 66A-67, 82); Exhibit 6, 37:20-25 (App. 95); *see also* Exhibit 1, 33:22 – 34:9 (App. 10-11).

[66] Exhibit 5, 8:10-14, 40:20-25, 41:16 – 42:8, 46:14-21, 49:20-50:1 (emphasis added) (App. 66A, 73-76).  Mr. Moscariello further concedes that Coastal Crating did not take any steps to keep its customer list confidential, including having its employees (to whom Coastal Crating's customers "were known … because they did the work") sign confidentiality agreements.  Exhibit 5, 78:24 – 79:19 (App. 83).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                    **12**

Q.    And if you look back at Deposition Exhibits 1 and 2, NEPC was not
in existence as a corporate entity in February of 2011, correct?

A.    Correct.

Q.    And as a nonexisting entity, it didn't have any assets, correct?

A.    Correct.

Q.    Did NEPC provide MEI with a list of customers in May of 2011?

A.    I don't recall.

Q.    Did NEPC have a list of customers in May of 2011?

A.    No, I don't recall that.

Q.    Did NEPC have any customers in May of 2011?

A.    I don't recall.

                                                        ***

Q.    The list that you were talking about earlier, is that a list that was
compiled when you were at Coastal Crating?

A.    Correct.

Q.    ***And that list was turned over to MEI from Coastal Crating***.
        MR. SMITH: Objection, form.

A.    ***I'll have to say yes***.

Indeed, Mr. Moscariello admits that the list of customers allegedly provided to MEI was

comprised of Coastal Crating's customers, including those that had storage in a

warehouse belonging to Coastal Crating and was never owned by NEPC.[67]  Further, Mr.

Moscariello concedes that MEI already knew of at least some the customers allegedly

provided to MEI.[68]

        Mr. Morris concedes that he has no personal knowledge of any assets, including

customer lists, being turned over from NEPC to MEI.[69]  Instead, he confirms Mr.

---

[67] Exhibit 5, 74:24 – 79:19 (App. 82-83); Exhibit 11 (App. 135); Exhibit 12 (App. 136-38).
[68] Exhibit 5, 27:4-10, 79:23-80:2 (App. 71, 83); Exhibit 12 (App. 136-38).
[69] Exhibit 7, 15:3-11, 16:14-16, 32:1-13, 32:19 – 33:18 (App. 108, 112).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                              **13**

Moscariello's testimony that the list of customers allegedly provided to MEI belonged to

Coastal Crating—***not NEPC***[70]:

> Q.   So MEI approached you and Emil about buying Coastal after, I'm assuming, there was some discussion and due diligence and then –
>
> A.   They didn't buy Coastal.
>
> Q.   I asked about Coastal.
>
> A.   They didn't buy Coastal; they bought the accounts.
>
> Q.   MEI bought the accounts of Coastal?
>
> A.   We turned over the accounts to them.
>
> Q.   Well, let's parse that a little bit.  Did MEI buy the accounts of Coastal?
>
> A.   In this agreement.
>
> Q.   Is that a yes?
>
> A.   Yes.
>
> Q.   So MEI bought the accounts of Coastal?
>
> A.   Yes.
>
> Q.   And you're saying that's reflected in Deposition Exhibit 3, the parameters agreement?
>
> A.   Yes.

In fact, Mr. Morris testified that the list of customers allegedly provided to MEI came

from an accounts receivable program ***belonging to Coastal Crating***.[71]  Elsewhere, both

Messrs. Moscariello and Morris admit that the lists of customers NEPC is now using in

this lawsuit as evidence of customers allegedly transferred from NEPC to MEI (Exhibits

---

[70] Exhibit 7, 47:12 – 48:5 (App. 116); *see also id.*, 18:6-9, 83:12 – 84:11 (App. 109, 124).
[71] *Id.*, 32:19-25 (App. 112); *see also id.*, 69:25 – 71:8 (App. 120-21) (Exhibit 12, App. 136-38 came from Coastal Crating accounting department).

11 and 12) not only was created for purposes of this litigation, but also lists ***Coastal Crating customers***.[72]

Coastal Crating filed a voluntary petition for reorganization under Chapter 11[73] of the United States Bankruptcy Code on August 31, 2010.[74]  Coastal Crating operated its business as a debtor-in-possession from that time until as recently as April 14, 2013, at which time the estate had been fully administered and the bankruptcy court issued its final decree releasing Coastal Crating from bankruptcy.[75]  NEPC concedes that the customers it alleges were turned over to MEI remained customers of Coastal Crating ***after*** the bankruptcy filing, but asserts that they somehow stopped being Coastal Crating customers on February 1, 2011—the alleged effective date of the MSA Parameters.[76] There are no records in the Coastal Crating bankruptcy matter—which was ongoing well before and well after the MSA Parameters' alleged effective date (February 1, 2011) and NEPC's incorporation (May 5, 2011)—approving, contemplating, or even mentioning the transfer of any customers or customer list from Coastal Crating to NEPC.[77]  On January 20, 2011, the bankruptcy court appointed a special purpose fiduciary for Coastal Crating

---

[72] Exhibit 5, 74:25 – 77:5 (Ex. 11, App. 135 is a list of Coastal Crating customers), 77:17 – 78:19 (Ex. 12, App. 136-38 is comprised of Coastal Crating customers) (App. 82-83); Exhibit 7, 75:22 – 76:9 (Ex. 11, App. 135 is a "monthly storage" list from Coastal Crating), 69:25 – 71:6, 79:14 – 80:15 (Ex. 12, App. 136-38 is comprised of Coastal Crating customers that came from Coastal Crating's accounting department) (App. 120-23).
[73] *See supra* note 33.
[74] *See In re: Coastal Crating Company, Ltd.*, case no. 4:10-bk-37421, S.D. Tex., at dkt. no. 1.
[75] *Id.* at dkt. nos. 211-12; *see also* Exhibit 5, 36:10 – 37:23 (Mr. Moscariello's concession that Coastal Crating was allowed to continue operating as debtor in possession after filing bankruptcy) (App. 72).
[76] Exhibit 6, 30:7 – 31:3 (testimony that the customers were "still using" Coastal Crating while "in bankruptcy" and "until February 1st") (App. 94).
[77] *In re: Coastal Crating Company, Ltd.*, case no. 4:10-bk-37421, S.D. Tex.; *see also* Exhibit 3, 22:25 – 23:2 (Ms. Moscariello's concession that she is not aware of Coastal Crating transferring any assets to NEPC) (App. 47); Exhibit 4, 17:17-19 (Ms. Morris' same concession) (App. 59).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                              **15**

and ordered that Mr. Morris' employment be terminated effective January 31, 2011, and

Mr. Moscariello's employment terminated effective March 31, 2011.[78]

> 6.     *NEPC never performed marketing services or generated revenues on behalf of MEI.*

Although the MSA Parameters contemplated NEPC doing so,[79] NEPC never

performed any marketing services or generated any revenues on behalf of MEI.  Ms.

Moscariello concedes the following:

- she has never done anything as the president of NEPC[80];

- she is not aware of any benefits that NEPC conveyed on to MEI, anything of value that NEPC has given to MEI, any services that NEPC has performed or provided to MEI, or any goods that NEPC has provided to MEI[81];

- she is not aware of Messrs. Moscariello or Morris doing anything to earn payments from MEI[82];

- she is not aware of NEPC doing anything to earn moneys from MEI[83];

- she is not aware of any marketing activities or sales efforts at NEPC, including by Messrs. Moscariello or Morris, and including on behalf of MEI[84];

- she is not aware of NEPC doing anything to cause customers to issue purchase orders to MEI or to secure quotes from potential or existing customers for MEI[85];

---

[78] Notably, on May 16, 2011, the special purpose fiduciary filed an adversarial action against Mr. Moscariello alleging, among other things, that "Emil Moscariello has used his control over Coastal and its assets for his personal and his brother's benefit to the detriment of creditors."  *Jones v. Moscariello*, adv. no. 11-03212, S.D. Tex. (J. Bohm) at dkt. no. 1.  Specifically, the fiduciary alleged that Mr. Moscariello made improper post-petition/fraudulent and/or preferential transfers of monies—there is no mention of customers or customer lists—to himself and his brother.  *Id.*  Mr. Moscariello settled the claims against him in exchange for a settlement payment.  *In re: Coastal Crating Company, Ltd.*, case no. 4:10-bk-37421, S.D. Tex., at dkt. nos. 201-03.

[79] Exhibit 10 at ¶¶ 4, 6 (App. 132, 134).

[80] Exhibit 3, 13:5-11 (App. 44).

[81] *Id.*, 31:16-25, 41:20 – 42:9 (App. 49, 51-52).

[82] *Id.*, 18:6-10 (App. 46).

[83] *Id.*, 41:17-19 (App. 51).

[84] *Id.*, 19:20 – 20:3, 30:6-9 (App. 46, 49).

- she has never had any discussions with any representatives of MEI[86];

- she is not aware of NEPC having any customers or clients[87];

- she is not aware of any documents or records of any sales or marketing efforts by NEPC since its inception[88];

- there are no books to take care of at NEPC[89]; and

- there are no NEPC corporate documents except for NEPC's formation documents.[90]

Indeed, ***Ms. Moscariello testified that she does not think it fair or right for NEPC to demand moneys from MEI without providing and goods or services to MEI***.[91]

Ms. Morris concedes the following:

- she is not aware of any sales efforts by NEPC on behalf of MEI, or any anything Messrs. Moscariello or Morris did to facilitate sales[92];

- she is not aware of any revenues that NEPC has generated for MEI[93];

- other than attending one annual meeting in December 2012, she has not taken any corporate acts or other actions on behalf of NEPC[94];

- she is not aware of NEPC passing any resolutions[95];

- she is not aware of NEPC having any customers at any time[96];

- she has no knowledge of any NEPC assets[97]; and

---

[85] *Id.*, 31:10-15 (App. 49).
[86] *Id.*, 27:24 – 28:1 (App. 48).
[87] *Id.*, 21:25 – 22:2, 46:4-6 (App. 46-47, 53).
[88] *Id.*, 38:9-12 (App. 51).
[89] *Id.*, 19:16-19 (App. 46).
[90] *Id.*, 25:24 – 26:6 (App. 47-48).
[91] *Id.*, 45:21-25 (App. 52).
[92] Exhibit 4, 10:2-8, 23:8-15 (App. 58, 61).
[93] *Id.*, 23:16-18 (App. 61).
[94] *Id.*, 7:11-21 (App. 57).
[95] *Id.*, 9:15-17 (App. 57).
[96] *Id.*, 11:8-13 (App. 58).
[97] *Id.*, 12:23-24 (App. 58).

- she is not aware of any corporate books or records other than NEPC's formation records and bank statements.[98]

NEPC has identified Messrs. Moscariello and Morris as the only NEPC employees who allegedly provided marketing services to MEI.[99]  When asked what work he has performed on behalf of NEPC, Mr. Moscariello testified as follows[100]:

> Q.   What did you do day-to-day work for NEPC?
>
> A.   Actually I don't remember doing anything day-to-day for NEPC.
>
> Q.   Do you recall doing anything for NEPC?
>
> A.   No, not really.
>
> Q.   Can you generally describe the things you have done for NEPC as an employee?
>
> A.   No.

Mr. Moscariello further concedes that:

- he is unable to recall or identify a single time in which NEPC caused a particular customer to issue a purchase order to, or otherwise purchase services from, MEI[101];

- he did not make any sales calls or put together any contracts for MEI while employed by NEPC[102];

- he is not aware of Ms. Moscariello, Ms. Morris, or Mr. Morris undertaking any sales efforts or activities on MEI's behalf[103];

- he does not recall any NEPC representative visiting any customers or job sites on behalf of MEI[104]; and

---

[98] *Id.*, 18:9-13, 33:7-23 (App. 60, 63).
[99] Exhibit 15 at response nos. 9, 17 (App. 149, 151).
[100] Exhibit 5, 14:3-10 (App. 68).
[101] *Id.*, 25:4-11, 80:25 – 81:11 (App. 70, 83).
[102] *Id.*, 35:13-18 (App. 72).
[103] *Id.*, 42:13-24 (App. 74).
[104] *Id.*, 58:10-12 (App. 78).

- NEPC does not keep any records.[105]

Mr. Morris likewise concedes that he is unable to identify any business that he secured from MEI while working with NEPC.[106]

> 7. *NEPC never met the minimum revenues that are a prerequisite to commissions.*

NEPC concedes that the MSA Parameters anticipates NEPC meeting certain minimum revenue requirements before MEI has any payment obligation[107]:

> Q.    Did the contract between MEI and NEPC that you testified about earlier, did it include what's called minimum cumulative revenue requirements?
>
> A.    I believe it did.
>
> Q.    What's your understanding of those minimum cumulative revenue requirements?
>
> A.    Well, that there would have to be a minimum amount of revenue produced in order to get paid.

NEPC never generated the minimum revenues contemplated under the MSA Parameters.[108]

> 8. *NEPC never provided MEI any evidence that any purported customer payment it received had appropriate pricing.*

The MSA Parameters provides the following[109]:

> For Revenues to be included in the calculations of revenue, payment must be received by customer and there must be evidence that pricing was appropriate, relative to the company pricing lists and profitability measurements.

---

[105] *Id.*, 23:13-15, 69:7-15 (App. 70, 80).

[106] Exhibit 7, 12:4-9, 41:17-19 (App. 107, 114).

[107] Exhibit 5, 22:8 – 23:7 (App. 70); *see also* Exhibit 6, 12:3-6 (NEPC's concession that, "[i]n order for [NEPC] to get the quarterly payment, [NEPC] ha[s] to generate revenue of a certain amount") (App. 89); Exhibit 10 (App. 132-34).

[108] Exhibit 5, 22:19 – 23:15 (App. 70); *see also* Exhibit 3, 18:6-10, 19:20 – 20:3, 30:6-9, 31:10-25, 41:17 – 42:9 (App. 46, 49, 51-52); Exhibit 4, 10:2-8, 23:8-18 (App. 58, 61); Exhibit 5, 14:3-10, 25:4-11, 35:13-18, 42:13-24, 58:10-12, 80:25 – 81:11 (App. 68, 70, 72, 74, 78, 83); Exhibit 7, 12:4-9, 41:17-19 (App. 107, 114).

[109] Exhibit 10 at ¶ 6 (App. 134).

NEPC never provided MEI any evidence that its pricing was appropriate, relative to MEI pricing lists and profitability measures, because NEPC has no records and did not bother to obtain a copy of MEI's pricing lists.[110]

> ### 9.    NEPC never caused Purchase Orders to be made directly to MEI.

The MSA Parameters also contemplated that "[w]ith the exception of Service Disabled Veteran contracts, all other customer POs should be made directly to MEI."[111] Ms. Moscariello, Ms. Morris, Mr. Moscariello and Mr. Morris all concede that they are unaware of NEPC ever causing any customer to issue any purchase orders to MEI.[112]

> ### 10.   Despite NEPC's failures, MEI made a good faith payment to NEPC out of good faith.

Although **an actual agreement was never yielded out of the MSA Parameters**, Messrs. Moscariello and Morris had been situated in an office on MEI's premises in anticipation of the completion of a formal marketing services arrangement between the parties.[113] During that time, MEI credited NEPC for certain sales made and, on or about May 20, 2011 (before discovering Mr. Morris' bad acts described above), made a payment of $70,398.05 to NEPC, as judicially admitted by NEPC.[114] Although an agreement including the MSA Parameters had not yet been consummated, and although NEPC had failed to meet revenue minimums contemplated by the MSA Parameters as a

---

[110] Exhibit 5, 64:15 – 65:14 (App. 79); Exhibit 7, 40:5-6 (App. 114); *see also* Exhibit 3, 19:16-19, 25:22 – 26:6 (App. 46-48); Exhibit 4, 18:9-13, 33:18-23 (App. 60, 63); Exhibit 5, 23:13-15 (NEPC has no records) (App. 70).
[111] Exhibit 10 at ¶ 8 (App. 134).
[112] Exhibit 3, 31:10-15 (App. 49); Exhibit 4, 12:10-15 (App. 58); Exhibit 5, 64:3-14 (App. 79); Exhibit 7, 36:24 – 37:19 (App. 113).
[113] Exhibit 5, 5:20-25 (App. 66); Exhibit 7, 37:25 – 38:15 (App. 113-14).
[114] Exhibit 1, 37:4-11 (App. 11); Exhibit 2, 35:15 – 36:2 (App. 38); *see also* dkt. no. 1 at ex. A (Petition), ¶¶ 14-15 and ex. B.  Because MEI denies that the MSA Parameters constitutes a contract, it disputes the notion that any services performed by NEPC, or any payment made by MEI to NEPC, are pursuant to, or arise under, the MSA Parameters.  *See* Exhibit 1, 42:18 – 43:4 (App. 13).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                      **20**

prerequisite to any payment to NEPC, MEI made the payment as a show of good faith that a formal agreement would be reached and NEPC would eventually meet the contemplated revenue targets.[115]

> **11.    After the good faith payment, NEPC still did not perform any marketing services or generate revenues on behalf of MEI.**

Both Messrs. Moscariello and Morris concede that, to the extent MEI held an obligation to pay NEPC, such compensation was commission-based and to be paid on a quarterly basis.[116]   The first quarterly payment reflected by MSA Parameters is dated April 30, 2011—before the date on which MEI made the $70,398.05 payment to NEPC.[117]   NEPC basis it damages on the allegation that MEI failed to make any further payments to NEPC after May 20, 2011, specifically during the next three quarters.[118]

NEPC did not provide any marketing services, or generate any revenues, for MEI after May 20, 2011, including within those following three quarters on which it bases its damages.[119]   Mr. Morris was prohibited from providing any services to MEI as early as May 26, 2011 and concedes he is unable to identify any revenues or business he secured on behalf of MEI.[120]   Mr. Moscariello specifically concedes that he did not provide any

---

[115] Exhibit 1, 24:4-17, 39:23 – 41:12, 42:18 – 43:19, 64:18-25 (App. 8, 12-13, 18); Exhibit 2, 34:8-21, 40:24 – 41:3 (App. 38-39).
[116] Exhibit 5, 12:24 – 13:3, 27:19-21, 57:1-7 (App. 67, 71, 77); Exhibit 6, 50:8-13 (App. 99); Exhibit 7, 24:2-4, 30:2-8 (App. 110, 112); *see also* Exhibit 10 (App. 132-34); dkt. no. 1 at ex. A (Petition), ¶ 16.
[117] Exhibit 10 at schedule A (App. 133).
[118] Dkt. no. 1 at ex. A (Petition), ¶¶ 15, 28.
[119] Exhibit 5, 20:23 – 22:7, 72:15-24 (Mr. Moscariello's concession that he has "no knowledge" as to any revenue generated by NEPC in the three quarters following May 20, 2011) (App. 69-70, 81); Exhibit 7, 12:4-9, 41:17-19 (App. 107, 114).
[120] Exhibit 7, 12:4-9, 41:17-19 (App. 107, 114); Exhibit 13 (App. 139).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

marketing services to MEI after May 20, 2011, and that he has no knowledge of NEPC generating any revenues for MEI during the following three quarters[121]:

> Q.    Did you provide any marketing services to MEI after, say, May 20, 2011?
>
> A.    I don't recall doing that, no.
>
> ***
>
> Q.    You don't know if NEPC generated any revenues for MEI for the quarter ending July 30, 2011, do you?
>
> A.    I have no knowledge of that.
>
> Q.    You have no knowledge as to any revenues generated by NEPC for MEI for the quarter ending October 30, 2011, do you?
>
> A.    No knowledge of that.
>
> Q.    And the same is true for the quarter ending January 30, 2012, correct?
>
> A.    Correct.

### iii.    NEPC Refused to Perform.

As part of its investigation arising out Mr. Morris' conduct, Mr. Cappello met with Mr. Moscariello and informed him that MEI wanted to continue working with Mr. Moscariello as a representative of NEPC but that Mr. Morris should not be included due to his conduct.[122] NEPC concedes that MEI did not have any obligation—contractual or otherwise—to allow Mr. Morris to work on its behalf.[123] ***Mr. Moscariello informed Mr. Cappello that he was not willing to work for MEI without Mr. Morris.***[124] With Mr. Moscariello refusing to perform for MEI on NEPC's behalf, and there being no other individuals associated with NEPC with any ability to provide marketing services or

---

[121] Exhibit 5, 24:13-15, 72:15-24 (App. 70, 81); *see also id.*, 20:23 – 22:7 (App. 69-70).
[122] Exhibit 1, 48:18 – 49:2 (App. 14); Exhibit 2, 15:18 – 16:1, 19:24 – 20:4, 21:2-18, 23:8 – 24:2 (App. 33-35); Exhibit 6, 25:2 – 27:7 (App. 92-93).
[123] Exhibit 7, 56:21 – 57:4 (App. 117).
[124] Exhibit 1, 48:18 – 49:14, 50:23 – 51:2 (App. 14-15); Exhibit 2, 23:16 – 24:2 (App. 35).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                              22

generate revenues in the crating and packaging business, MEI saw no reason to move forward with a marketing relationship with NEPC, including the execution of any marketing services agreement.[125]  This is reflected by Mr. Cappello's narration of MEI's meeting with Mr. Moscariello[126]:

> Q.  What else was discussed, if you can recall?
>
> A.  Whether or not Emil [Moscariello] was going to continue to represent MEI or NEPC.
>
> Q.  Was there any conclusion to that part of the conversation?  In other words, was he going to stay or not stay or was it an MEI election?
>
> A.  He was not staying.  He said he couldn't leave Garry.
>
> Q.  So, as you departed from that meeting, what was your understanding as to MEI's relationship with NEPC?
>
> A.  That as a practical matter, it was moot.  The two salesmen were no longer representing MEI.

iv.    <u>NEPC Sued MEI</u>.

Approximately eight months later, NEPC filed this action against MEI.  Neither Ms. Moscariello nor Ms. Morris were involved in the decision for NEPC to sue MEI.[127]  Neither Mr. Moscariello nor Mr. Morris recall reviewing NEPC's *Original Petition* before it was filed.[128]

## IV.    REQUEST FOR RELIEF

For the reasons described herein and in the Brief, Defendant MEI, LLC d/b/a MEI Rigging & Crating, LLC respectfully requests that this Court grant Defendant's Motion for Final Summary Judgment on Plaintiff NEPC, Inc.'s claims of breach of contract,

---

[125] Exhibit 1, 44:17-23 (App. 13); Exhibit 2, 23:16 – 24:2, 36:20 – 37:6 (App. 35, 38); Exhibit 3, 8:18-24, 20:4-20 (App. 43, 46); Exhibit 4, 4:20 – 5:10, 6:17-19 (App. 56-57).
[126] Exhibit 2, 23:16 – 24:2 (App. 35).
[127] Exhibit 3, 17:1-3 (App. 45); Exhibit 4, 19:8-10 (App. 60).
[128] Exhibit 5, 84:5-8 (App. 84); Exhibit 7, 75:2-5 (App. 122).

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                                    23

*quantum meruit*, and attorneys' fees, that Plaintiff's claims be dismissed with prejudice, and that this Court grant such other and further relief, general or special, at law or in equity, to which Defendant is justly entitled.

Respectfully submitted,

GARDERE WYNNE SEWELL LLP

By: */s/ Dwight M. Francis*
      DWIGHT M. FRANCIS
      Texas Bar No.  00785877
      1601 Elm Street
      Suite 3000
      Dallas, Texas  75201
      Telephone:     214-999-3000
      Facsimile:     214-999-4667

**ATTORNEYS FOR DEFENDANT MEI, LLC d/b/a MEI RIGGING & CRATING, LLC**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been has been served via certified mail, return receipt requested on this the 10th day of May, 2013:

David M. Smith
THE LAW OFFICE OF DAVID M. SMITH
2777 Allen Parkway, Ste. 1000
Houston, TX 77019-2165

*/s/ Dwight M. Francis*
Dwight M. Francis