UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NEPC, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. H-12-cv-706 |
| | § | |
| MEI, LLC d/b/a MEI RIGGING & | § | |
| CRATING, LLC | § | |
| | § | |
| *Defendant.* | | |

## MEMORANDUM AND ORDER

This lawsuit arises out of a dispute between Plaintiff, NEPC, Inc. ("NEPC") and Defendant MEI LLC d/b/a MEI Rigging & Crating, LLC ("MEI"). The parties have consented to the jurisdiction of this Court pursuant to 28 U.S.C. section 636(c). (Dkt. 9). MEI now seeks final summary judgment on all of the claims asserted against it by NEPC. (Dkt. 18). NEPC has sued MEI for an alleged breach of contract, claiming that MEI owes it $211,194.15 for marketing and sales services NEPC provided in early 2011.

Having considered MEI's motion, the response in opposition, the briefing, the arguments submitted by the parties, the summary judgment record, and the applicable law, the Court **GRANTS** MEI's motion for summary judgment, in part, and **DENIES** MEI's motion, in part.

# BACKGROUND

### A. MEI

MEI is an Oregon company that does business in several locations in Texas. MEI's business is "crating"—"build[ing] boxes" for industrial and commercial crating, and "rigging"—"moving heavy industrial machinery."

### B. Coastal Crating

Coastal Crating was a Houston-based crating company that entered into bankruptcy in 2010. Prior to the bankruptcy, MEI considered purchasing Coastal. MEI's representatives met with Coastal's President and majority owner, Emil Moscariello.[1] MEI decided not to purchase Coastal, and Coastal went into bankruptcy. During the bankruptcy process, MEI purchased some of Coastal's physical assets. At some point in early 2011, Moscariello and Morris began to work out of offices on MEI's premises, first for Coastal, then, after the bankruptcy court terminated Morris and Moscariello as employees and officers of Coastal, as independent sales agents for MEI. During this time, MEI also hired several other former Coastal employees, including Coastal's former Office Manager and a former Crating Manager. Some of Coastal's clients had warehoused goods with Coastal, and these goods were transferred to MEI's warehousing facility after Coastal ceased operating.

### C. NEPC is formed and the MSA is signed.

Using the customer list they compiled while at Coastal, Moscariello and Morris planned to work as independent sales agents of MEI. Accordingly, Moscariello and

---

[1] Moscariello owned 88% of Coastal and the Vice President, Gary Morris, owned 12%.

Morris asked their wives, who were both flight attendants without any experience in the crating or rigging industry, to form a new corporation.  They called this new corporation NEPC.  Moscariello and Morris were to be the sole employees of NEPC.  While NEPC was still forming, and before its incorporation documents were filed with the State of Texas, Moscariello and Morris began negotiating a contract with MEI.  Moscariello and Morris proposed that their new company, NEPC, receive commissions for any packing and rigging jobs they referred to MEI from former Coastal customers.  To facilitate this arrangement, a document entitled "Marketing Services Agreement Parameters" ("MSA") was drafted by Seth Christensen, the Chief Financial Officer of MEI, with input from Moscariello.

The MSA states as follows:

MEI will engage NEPC in a marketing services agreement with the following parameters.

1.      The effective date will be 2/1/11.

2.      Quarterly payments will be based on Schedule A below.

3.      NEPC will be solely responsible for all salaries and expenses associated with running their business.  The intention is for the business to be an independent contractor . . . .

4.      If Revenues generated by NEPC fall below the cumulative minimum listed on Schedule A for a given quarter, the scheduled payment will be reduced proportionally to offset the deficit.  The payment in future quarters can be increased to catch-up for any shortfall as revenues increase above the minimum.  Schedule B shows an example of how this would work.

5.      Customers associated with NEPC will be clearly listed as of the date of this agreement and added to every time a new customer is added by

the sales efforts of NEPC.  Revenues will be credited regardless of whether the work is crating or rigging related.

6.      For Revenues to be included in the calculations of revenue, payment must be received by customer and there must be evidence that pricing was appropriate, relative to the company pricing lists and profitability measurements . . . .

7.      Added commission will be earned for sales above $1.25mm in a quarter, with rates as follows (see Schedule C for an example).

   a. 5% for standard crating or rigging sales
   b. 10% for contracts obtained by NEPC as part of the Service Disabled Veteran designation and subcontracted to MEI.

8.      With the exception of Service Disabled Veteran Contracts, all other customer POs should be made directly to MEI.

9.      MEI will provide email addresses and business cards for certain employees of NEPC, along with office space and office phones at our Houston location.

The MSA contained Schedule A, a chart of "Scheduled Quarterly Payments & Revenue Targets" and Schedule B, a table titled "Example of how a shortfall in revenues would adjust payments in one quarter, and allow catch-up in the next."

The MSA was sent to NEPC. It was signed by both Moscariello's wife and Morris' wife—the President and Secretary, as well as the owners and directors, of the new corporation. Mrs. Moscariello and Mrs. Morris did not date their signatures. NEPC's certificate of formation was filed with the Office of the Secretary of State of Texas on May 5, 2011. MEI contends that it did not receive a copy of the MSA signed by Mrs. Moscariello and Mrs. Morris until at least May 5, 2011 or after.

4

### D. NEPC's efforts after the MSA is signed

At an unknown time, MEI's accounting system was modified to track any sales made by NEPC. NEPC's pleadings allege that it provided a list of former Coastal customers to MEI. However, Moscariello and Morris gave conflicting and ambiguous testimony about this list, who owned it, when it was compiled, and how it was delivered to MEI. With respect to the list's ownership, Moscariello and Morris both admitted that the list was Coastal's asset and not an asset of NEPC. Moscariello also admitted in his deposition that the list was compiled when he was still at Coastal and that the list was turned over to MEI by Coastal, not NEPC. Similarly, Morris repeatedly described the MSA as "MEI [buying] the accounts of Coastal." At other times, however, Moscariello and Morris contended that the list was their own personal property because it was a list of relationships they had independently developed, albeit during their employment with Coastal. Another point of ambiguity was that neither Moscariello nor Morris could pin down the exact manner or time that the list was turned over to MEI. Moscariello only testified that, although he could not remember whether the list was sent by email, fax, or hard copy—and although he had no proof of the list's existence—he knew "[s]omething was turned over to [MEI]." Morris' testimony was also equivocal. MEI denies that it ever received such a list.

The evidence regarding NEPC's sales efforts and results is similarly thin. Moscariello and Morris both testified that they made sales calls upon former Coastal customers, suggesting that these former clients send business to MEI. Moscariello testified that, between February 1, 2011 and April 30, 2011, these sales efforts resulted in

some number of former Coastal customers sending an unknown amount of orders to MEI. However, neither Moscariello nor Morris could name a specific number of customers or a definite amount of business that these sales efforts generated. Further, Moscariello admitted that he never obtained MEI's price list for use during these sales calls, even though the MSA requires that NEPC use MEI's price list during any sales efforts.

MEI does admit that it did business with former Coastal customers during the first quarter of 2011, and MEI's accounting system credited some of this revenue as sales made by NEPC. However, MEI disputes the notion that all of these sales were the products of Moscariello and Morris' efforts. In fact, Moscariello and Morris were not the only former Coastal employees making sales efforts for MEI during this time. MEI's new Office Manager—a former Coastal employee who was unaffiliated with NEPC— was also simultaneously sending out e-mails to former Coastal customers. Further, MEI had its own in-house sales personnel conducting sales and contacting prospective customers.

### E. MEI pays NEPC $70,398.05

On May 20, 2011, MEI paid NEPC $ 70,398.05 via wire transfer. The parties agree on the fact that the payment was made and received, but they disagree about the reason the payment was issued. NEPC contends this was the first payment under the MSA for commissions its earned from its sales efforts. In contrast, MEI describes the payment as a "good faith payment" made to reward NEPC for whatever amount of business it generated in February 2011. MEI contends that the payment cannot be

characterized as being "made under the MSA" because the revenues NEPC generated in the first quarter of 2011 did not meet or exceed the minimum revenue quotas of the MSA.

### F. MEI suspends Gary Morris as its agent

Shortly after the May 20th payment was made and received, MEI notified NEPC that it no longer wanted Morris to work on its behalf.  MEI sent NEPC a letter stating Morris had (1) made disparaging remarks about MEI and (2) attempted to engage in business with a competitor of MEI.  MEI stated Morris had "committed a serious breach of trust . . . in his representation of MEI" and therefore "ask[ed] that Mr. Morris be removed from our account."  The letter concluded, "We are also suspending the right of NEPC to act on MEI's behalf pending further investigation into how our account has been handled."

Dan Cappello, the CEO of MEI, met with Moscariello as part of MEI's investigation.  Cappello and Moscariello gave differing accounts of the meeting.  According to Cappello, Moscariello told him that he was unwilling to work without Morris.  While the meeting was taking place, and without Moscariello's knowledge, the contents of Moscariello's and Morris' offices were being packed at MEI's premises.  Cappello testified that the packing of Moscariello's belonging was inadvertent—he stated told MEI employees only to pack Morris' belongings but that both offices were packed by mistake.  Moscariello stated that he interpreted the packing of the offices as a statement that he and Morris "were not allowed" to make further sales calls on MEI's behalf—"We were shut out of the premises, so we did not make sales calls."  However, Moscariello also stated that MEI did request that he continue making sales on MEI's

behalf, as NEPC's sole employee. Moscariello testified that he briefly set up an office for NEPC in his house, and he testified that he tried to send some sales to MEI, but the business was refused. MEI's representatives did not verify any such sales efforts.

## PROCEDURAL HISTORY

On January 30, 2012, NEPC filed suit against MEI in Texas state court. (Dkt. 1). NEPC alleged that the MSA was a binding contract, that it performed its obligations under the MSA, and that MEI breached the MSA by failing to make the payments required by that document. NEPC asserted claims of breach of contract and quantum meruit, seeking $211,194.15 in damages plus its costs and attorney's fees. (Id.)

MEI removed the lawsuit to this Court on the basis of diversity jurisdiction. (Dkt. 1). MEI denied NEPC's claims and raised the affirmative defenses of statute of frauds, failure to mitigate damages, contributory negligence, waiver, estoppel, unclean hands, failure of consideration, prior material breach, and accord and satisfaction. (Dkt. 14).

MEI now seeks summary judgment in its favor on all of NEPC's claims against it. First, MEI argues that the MSA is not an enforceable contract. MEI next contends that, even if the MSA is an enforceable contract, NEPC failed to perform under the MSA. Additionally, MEI contends there is no evidence that it breached the contract. MEI further challenges NEPC's damages as speculative, and it contends that NEPC's quantum meruit claims fail as a matter of law. Finally, MEI asserts that it has affirmative defenses that can be established as a matter of law: (1) that the MSA does not satisfy the statute of frauds; and (2) that any breach by MEI is excused by NEPC's prior material breach. For

8

its part, NEPC's response contends that the MSA is a valid and binding contract and that genuine issues of material fact preclude summary judgment for MEI.

The summary judgment record consists of the full text of the depositions of Seth Christensen, Daniel J. Cappello, Doris Moscariello, Valerie Morris, Emil Moscariello, and Garry Morris, as well as the MSA and the incorporation documents of NEPC. Further, the record includes documents that were made and produced during the discovery process—NEPC compiled and produced two lists of companies that it contends became customers of MEI "as a result of sales efforts by NEPC," and MEI created and produced a chart showing the total sales made to those customers.

## ANALYSIS

### A. Standard of Review

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift*

*Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

"Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment," and "[a] failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (internal quotation marks and citation omitted). A nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment. *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004). Furthermore, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## B. The MSA is not an enforceable contract under Texas law.

MEI raises multiple arguments against the MSA being a valid contract under Texas law, including pointing out that the MSA was executed prior to NEPC's existence,

attacking the completeness of the MSA as a contract, and contending the MSA violates the statute of frauds. NEPC responds to each of these points in turn. First, it contends that there is at least a fact question whether NEPC and its officers, Mrs. Moscariello and Mrs. Morris, properly ratified the MSA after NEPC's incorporation. Further, NEPC contends the MSA sufficiently defines all of the essential terms of the parties' agreement. The Court finds the MSA is not an enforceable contract under Texas law.

### 1. An enforceable contract's material terms must be "sufficiently definite."

The elements of contract formation in Texas are "offer, acceptance, and a 'meeting of the minds.'" *Bocchi Ams. Assocs., Inc. v. Commerce Fresh Mkt., Inc.*, 515 F.3d 383, 392 (5th Cir. 2008) (citing *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)). The phrase "meeting of the minds" describes the necessary mutual understanding regarding the essential terms of the contract. *Potcinske v. McDonald Prop. Invs., Ltd.*, 245 S.W.3d 526, 530 (Tex. App.—Houston [1st Dist.] 2007, no pet.). This mutual understanding on essential terms must be "sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *see also Xing Zhao v. Hudgens Group, Inc.*, No. 14-10-00081-CV, 2011 WL 2347709, at *5 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("[I]f an alleged agreement is so indefinite as to make it impossible to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract."). Whether the parties' mutual understanding is spelled out in sufficient detail is a question of law for the court. *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 664–65 (Tex. App.—Dallas

2004, pet. denied) ("Whether an agreement fails for indefiniteness is a question of law to be determined by the court.").

### 2. The MSA does not contain a definite price term, nor does it provide any data to calculate a "reasonable price."

The Court has examined the MSA and the evidence in the summary judgment record. The Court concludes that the MSA is not an enforceable contract—its price terms are so indefinite that it is impossible to "fix the legal obligations and liabilities of the parties," as required by Texas law. It is not possible to calculate what amounts might have been owed to NEPC under the MSA. No minimum price, nor any maximum price, can be found. It is undisputed that the MSA sets out a schedule of payments to NEPC and calls for those payments to increase or decrease according to NEPC's sales performance. The evidence of NEPC's sales performance is contested. Even if it were not, however, the MSA does not provide a method to calculate the degree to which any contemplated payments would go up or down based on a level of sales. Simply put— there is no floor, no ceiling, and there are no data points in between.

### a. The MSA contemplates that payments to NEPC will vary "proportionately," according to whether NEPC's sales are below the required cumulative total sales.

Paragraph 4 of the MSA states that, "[i]f revenues generated by NEPC fall below the cumulative minimum listed on Schedule A for a given quarter, the scheduled payment will be reduced *proportionally* to offset the deficit. The payment in future quarters can be increased to catch-up for any shortfall as revenues increase above the minimum. Schedule B shows an example of how this would work." (emphasis added). Paragraph 7

further creates a commission structure for sales in a quarter that exceeded $1,250,000, and referred to a Schedule C as an "example." Schedule A and Schedule B are part of the MSA. Schedule C is not in the record.

Schedule A, a table entitled "Scheduled Quarterly Payments & Revenue Targets," lists 22 contemplated quarterly payments beginning in April 2011, which increase over time from $70,000 to $138,000. Schedule A also lists target sales revenues and cumulative sales targets for each of these quarters. The final column on Schedule A lists increasing dollar amounts of "cumulative minimum sales revenue" for each of the 22 quarters—$250,000 for the first quarter, increasing each time until the last quarter's total cumulative minimum revenue of $20,877,230.

Reading Schedule A together with Paragraph 4 of the MSA, the MSA states that, if the cumulative sales generated by NEPC did not meet the amounts in Schedule A's "Cumulative Minimum Revenues" column for a given quarter, then NEPC's scheduled quarterly payment would be "reduced *proportionately* to offset the deficit." (emphasis added). Paragraph 4 of the MSA states, "Schedule B shows an example of how this would work." In other words, although Schedule A listed sales goals and minimums for each individual quarter, it was NEPC's *cumulative* sales performance that would impact its quarterly payments "proportionately." But the word "proportionately" is not defined in the MSA, and Schedule B—although the MSA refers to it as "an example of how this might work"—does nothing to clarify the term.

### b. The MSA, Schedule A and Schedule B do not explain all of the necessary components of the formula to determine the amount owed to NEPC.

The MSA describes Schedule B as an "example" of the "proportionate" reduction of NEPC's quarterly payment if it failed to meet its cumulative sales targets. Schedule B covers a five-quarter period from April 30, 2011 through April 30, 2012. Schedule B's "Cumulative Minimum Revenues" column imports the amounts for these quarters from Schedule A. Schedule B then gives hypothetical NEPC sales revenues and cumulative totals for each quarter, and compares the hypothetical cumulative sales revenues against the cumulative targets set out in Schedule A. The last column of Schedule B shows a hypothetical "Actual Payment" of varying dollar amounts. Paragraph 4 of the MSA states that these amounts are calculated by *proportionately* adjusting the scheduled $70,000 payment according to whether NEPC's hypothetical cumulative sales were above or below Schedule A's cumulative minimum sales total. But no discernible "proportionate" relationship exists between the hypothetical payments and the hypothetical sales performance.

For example, for July 30, 2011, Schedule B posits a hypothetical cumulative actual revenue of $1,050,000—$81,250 over that period's "cumulative minimum revenue" of $96,875. Schedule B's "actual payment" to NEPC for that quarter is $70,000. In the next quarter, the hypothetical cumulative actual revenue is $1,600,000—$87,500 under the "cumulative minimum revenue" of $1,687,500, roughly 94.81% of the "cumulative minimum revenue" target. The proposed payment for that period is $69,100, or roughly 98.72% of the proposed $70,000. In other words, the *"proportionate"*

14

payments described in Paragraph 4 of the MSA cannot be calculated by using the "*proportionate*" difference between the "cumulative minimum" sales targets and the "cumulative actual" sales achieved.

### c. Even the drafter of the MSA could not explain the formula.

What then, is the formula?  Even Seth Christensen, the primary drafter of the MSA, admitted that he did not know.  Christensen could not explain the methodology behind Schedule B and the proposed "*proportional*" reduction of payments if NEPC failed to meet its sales goals.  He testified that he "[did not] recall exactly how the numbers were created" to "come up with the payment basis."  (Dkt. 24-1 at 13).

Christensen explained that the May 2011 payment could not shed any light on the MSA's formula because the payment amount was not calculated under the MSA— instead, MEI decided to pay $70,000, plus $398.05 for travel expenses, to NEPC "[p]rimarily [as] a show of good faith," not because MEI believed that was the actual dollar figure dictated by Paragraph 4.  (*Id.* at 14) ("At that point they had not met the cumulative revenue targets but we still had hope and expectation that they would be able to.").  Similarly, although NEPC continues to contend that it was entitled to the $70,000 "under the MSA," it has not produced any evidence to explain how the amounts of the proposed payments in Schedule B were calculated or to explain how its sales performance would impact its payments.

15

3. **Because the MSA does not contain a price term or any data to calculate the price the parties agreed upon, it is not an enforceable contract under Texas law.**

Here, NEPC contends the MSA is a contract for sales services. It is true that, under Texas law, a services contract lacking a fixed total price is not necessarily unenforceable. For example, the Texas Supreme Court stated in *Sacks v. Haden* that "'[w]here the parties have done everything else necessary to make a binding agreement for the sale of goods or services, their failure to specify the price does not leave the contract so incomplete that it cannot be enforced.'" 266 S.W.3d 447, 450 (Tex. 2008) (citation omitted). In such cases, courts are to "presume that a reasonable price was intended." *Id.* (citation omitted).

The Texas Supreme Court's pronouncement in *Sacks* arose from a contract dispute between an attorney and his client. Although the attorney and his client had not agreed on a total sum price for the attorney's services, there was evidence that they had agreed upon a specific hourly rate and "[t]he contract was explicit as to the services to be rendered and the manner that would be used in determining the price." *Id.* In short, in *Sacks* and similar cases, courts and juries were given some data upon which to base a finding of a "reasonable price." *See, e.g., Outdoors v. Noah*, No. 2-09-247-CV, 2010 WL 1946872 (Tex. App.—Fort Worth, May 12, 2010, no pet.) (evidence was legally sufficient to establish implied contract even though the parties did not agree on a set price, but defendant told plaintiff he would pay him "at least $3,000 a month"); *Inimitable Grp., L.P. v. Westwood Grp. Dev.*, 264 S.W.3d 892 (Tex. App.—Fort Worth 2008, no pet.) (although oral contract did not include price, Defendant agreed to "at least

reimburse [Plaintiff] for its expenses related to providing the interior design services"); *Hales v. Peters*, 162 S.W. 386, 394 (Tex. Civ. App.—Dallas 1914, writ ref'd) (where Defendant promised to pay a "reasonable price" for an interest in land inherited by eight siblings, and five of those siblings sued for failure to pay, contract was enforceable because evidence proved reasonable value of the land, and "the interest of the children and amount appellant promised to pay was capable of being rendered certain by a mere mathematical calculation").

In contrast, in the MSA, no such guidance on "the manner to be used" in calculating the amount owed is given. The payments in Schedule A are acknowledged to be variable, and the proposed variations of these payments in Schedule B are wholly unexplained.  There is no basis for the Court, or a jury, to calculate the minimum, maximum, expected, or reasonable prices for NEPC's services under the MSA.  No minimum rate is stated.  Similarly no maximum rate is stated—although Schedule A lists a maximum total cumulative payment of $2,240,000, even this ceiling can vary according to the terms of Paragraph 7 and the missing Schedule C.  Further, unlike *Sacks*, there is no hourly rate sheet or clear agreement as to "the manner that would be used in determining the price."  Accordingly, the MSA is not an enforceable contract under Texas law because the Court cannot "understand what the promisor undertook." *T.O. Stanley Boot Co.*, 847 S.W.2d at 221.[2]

---

[2] Even NEPC is not sure what it agreed to.  NEPC's damages model bears no logical relationship to the proposed payment schedule in the MSA, and NEPC's summary judgment briefing points to no evidence supporting any damages.

### C. NEPC's damages cannot be calculated with any certainty, and summary judgment is therefore proper on its breach of contract claim.

Even assuming, *arguendo*, that the MSA is a valid contract under Texas law, MEI further contends that summary judgment should be entered on NEPC's breach of contract claim because NEPC's damages are unduly speculative, and because NEPC has failed to present any evidence to support the damages it seeks. In response, NEPC correctly notes that Texas law allows a breach of contract plaintiff to seek his expectancy or benefit-of-the-bargain damages, and NEPC contends that it merely seeks to recoup the benefit of its bargain under the MSA. Based upon the summary judgment record, the Court finds that summary judgment should be entered in favor of MEI.

### 1. Expectancy damages recapture the "benefit of the bargain."

An essential element of NEPC's breach of contract claim is that it sustained damages. *See, e.g., Southern Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 323-324 (Tex. App.–Houston [1st Dist.] 2011, pet. denied ) ("To prevail on a claim for breach of contract, the plaintiff must establish the following elements: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."). In Texas, "[t]he normal measure of damages in a breach-of-contract case is the expectancy or benefit-of-the-bargain measure;" the purpose of which is to "restore the injured party to the economic position it would have occupied had the contract been performed." *Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 607 (Tex. App.–Houston [14 Dist.] 2012, no pet.). NEPC's "expectancy damages"

include its expected receipts under the contract, plus any losses caused by MEI's breach, less any costs or other loss that NEPC avoided by not having to perform. *See, e.g., Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148-149 (Tex. App.–Dallas 2012, no pet.) ("[I]t must be determined what additions to the injured party's wealth have been prevented by the breach [of contract] and what subtractions from his wealth have been caused by it."). However, "a party may not recover damages for breach of contract if those damages are remote, contingent, speculative, or conjectural." *Southern Elec.*, 355 S.W.3d at 324. "A plaintiff's failure to show either the existence or the amount of lost profits will necessarily prevent their recovery." *Burkhart Grob Luft Und Raumfahrt GmbH & Co. v. E–Systems, Inc.*, 257 F.3d 461, 467 (5th Cir. 2001).

When a plaintiff seeks lost profits as part of its breach of contract damages, Texas courts do not require the lost profits be "susceptible to exact calculation," but "competent evidence" must show the amount of lost profits with "reasonable certainty." *Szczepanik v. First Southern Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994). "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Id.* This is especially true when the business venture in question is new or unproven. *See, e.g., Burkhart Grob Luft Und Raumfahrt GmbH & Co.*, 257 F.3d at 467–68 (trial court correctly determined there was no evidence to prove lost profits with reasonable certainty in light of plaintiff's inexperience in building jet aircraft, its lack of a history of success, and lack of evidence that its bid would have been chosen over twelve others); *Tex. Instruments, Inc. v. Teletron Energy Mgm't, Inc.*, 877 S.W.2d 276, 280 (Tex. 1994) (stating that "[t]he mere

hope for success of an untried enterprise, even when that hope is realistic, is not enough for recovery of lost profits"); *Ramco Oil & Gas Ltd. v. Anglo–Dutch (Tenge) L.L.C.*, 207 S.W.3d 801 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (holding there was no evidence to prove lost profits with required reasonable certainty because proof of lost profits offered at trial was "largely speculative, dependent on uncertain and changing market conditions, and based on risky business opportunities and the success of an unproven enterprise.").

### 2.  There is no evidence in the record of NEPC's expectation damages.

MEI contends that it is entitled to summary judgment because NEPC's damages model is unduly speculative.  As discussed above, NEPC's Complaint seeks $211,194.15, based upon its allegation that "it is reasonable to conclude that the commissions and payment to NEPC for the last three quarters would be similar to that of the first payment [of $70,398.05]."  This damages model bears no relationship to the payment schedule set out in the MSA.

Further, NEPC's summary judgment briefing does not point to any evidence that can be used in calculating its breach of contract damages.  There is no evidence in the summary judgment record showing any of NEPC's anticipated receipts or losses under the MSA.  There is no evidence supporting NEPC's anticipated receipts under the MSA.  Although there is some evidence that MEI conducted business with former Coastal customers during the relevant time period, MEI contends that the cumulative minimal total sales were not satisfied and no payment was due under the MSA.  Even more problematic for NEPC is the admission by Moscariello that he and Morris failed to obtain

an MEI pricing list to guide their sales efforts, and any sales made could not qualify for consideration under the MSA. Similarly, there is no evidence of any costs or losses incurred by NEPC during the sales efforts Moscariello and Morris insisted took place. In short, the summary judgment record is devoid of the required "objective facts, figures, or data from which the amount of lost profits may be ascertained." *Szczepanik*, 883 S.W.2d at 649; *see, e.g., Parkway Dental*, 391 S.W.3d at 608-609 (summary judgment for defendant was proper where record contained affidavit that plaintiff had "lost profits" but did not include estimated amount of profits that would have been made, any single calculation of lost-profits damages based on net profits, or any opinion or estimates based on objective facts, figures, or data).

Finally, even if there were some "competent" evidence in the record showing NEPC's anticipated receipts and the costs of performing with "reasonable certainty," as required by Texas law, the fundamental problem in this case still remains—it is impossible to calculate what payments NEPC would have been owed under the MSA. Accordingly, summary judgment for MEI on NEPC's breach of contract claim is proper.

**D. NEPC's quantum meruit claims survive summary judgment.**

Quantum meruit is an equitable remedy based upon an implied promise to pay for beneficial services rendered and knowingly accepted. *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005). A plaintiff must establish that valuable services were furnished to and accepted by the defendant "under such circumstances as reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the

recipient." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

MEI contends that it is entitled to summary judgment on NEPC's quantum meruit claim because there is no evidence that NEPC provided anything of value.   MEI characterizes NEPC's request for damages in the amount of $211,194.15 as a request to be paid "for doing nothing."   However, the depositions of Emil Moscariello and Garry Morris present some evidence that they, as employees of NEPC, made sales efforts on behalf of MEI.   Moscariello insisted that these efforts produced some revenue for MEI, and MEI admits that it did business with former Coastal customers during this time. Similarly, the payment that MEI concedes it made to NEPC "in good faith" is some evidence that those services by Moscariello and Morris could be determined to be valuable.   The evidence supporting NEPC's quantum meruit claims is both disputed and sparse, but the Court finds that it is more than a "scintilla" and therefore entitles NEPC to proceed to a jury on its quantum meruit claims.

## CONCLUSION

MEI is entitled to summary judgment as a matter of law on NEPC's breach of contract claim because the MSA is not an enforceable contract under Texas law, and because NEPC has failed to present any evidence to support its benefit of the bargain measure of damages. Accordingly, the Court **GRANTS** summary judgment for MEI on all of NEPC's breach of contract claims in this case.

For the foregoing reasons, MEI's motion for summary judgment on NEPC's quantum meruit claims against it is **DENIED**.

**SIGNED** AT **HOUSTON, TEXAS**, on July 22, 2013.

**GEORGE C. HANKS, JR.**
**UNITED STATES MAGISTRATE JUDGE**